case number 20-3012. United States of America v. Waldemar Lorenzana-Lima also known as Waldemar Lorenzana-Lima appellant. Mr. Zucker for the appellant, Ms. Rostetler for the appellate. Morning, counsel. Mr. Zucker, when you're ready, please proceed. Thank you very much. John Zucker on behalf of the appellant requests five minutes for rebuttal. The issue before us is, well, there's essentially two issues. The first issue being whether or not there was a sentencing enhancement during the plea proceeding. As the court's well aware, 11b1n requires the court to advise when there is a sentencing waiver. And I will concede at the outset that the plea agreement, the written plea agreement, complies with all the requirements. The issue before us, and it's the issue that arises, and I guess the lead cases in this jurisdiction are the Brown and the Godoy case, is when the inquiry or the colloquy between the defendant at the time of the plea creates an ambiguity that could cause confusion. And we are not, again, challenging that there's an ambiguity about the entry of the plea. We are challenging only whether there was an ambiguity and confusion created by the court's colloquy in relation to the defendant waiving the sentence enhancement. And the court's comments at the time, respectfully, raise that issue. The court says if the sentence exceeded the maximum, which would be an illegal sentence, frankly, or if there was an upward departure. And at the time, in this case, there was, although there was an agreement on plea, there was a dispute between the parties about the sentencing guidelines, calculations, and particularly the leadership enhancement. And the danger here is that the court's colloquy did not apprise the defendant. He was waiving his right to challenge that decision from the court. Just one question back about the plea agreement itself. In the plea agreement itself, was he ever given a Spanish translation? It sounds like from the transcript that it was just explained to him orally by his attorneys. But was he ever given a Spanish translation of the plea agreement? I don't think so. I don't know, in all candor. I was not at the trial level. My recollection from the transcript is the same as yours, that it was given an not a printed, translated copy. I know his lawyer was also a native Spanish speaker, and I don't know if that matters. But no, I think the answer to your question is no, but I'm not sure. Okay, sorry to interrupt. Go ahead. No problem. So anyway, the issue becomes is when the court says, the court never said to the defendant, an illegal sentence would only be that which exceeds the statutory maximum of 40 years. And as the Brown Court pointed out, we have to analyze these in the context of who is the defendant? What is his background? What is it reasonable to expect of him? And as the Brown Court pointed out, it's not reasonable to expect the defendant to understand the legal Argo and understand the nuances of maximum upward departure versus enhancement. And that's why this case is here. And that's why I suggest that there was not a valid waiver during the colloquy, there was confusion during the colloquy, and the defendant proceeded and his substantial rights were prejudiced. So if the court agrees with that, we turn to the second issue is whether or not I have another question. I have another question on this. I know that Mr. Lorenzo Lima doesn't speak English. And so we had a Spanish translator throughout the pre hearing, is there any transcript or recording of what the Spanish translator, the words that translator was using? Not that I'm aware of. And I sincerely doubt there would be. And I think it would also probably be his lawyer, that would probably be a privileged conversation. But as far as I know, there's no record of exactly what the Spanish translator nor right, I'm not, I don't know why the translators translation of a public proceeding would be privileged. It's a good question. If it was, if it was a public proceeding, then by all means, the plea hearing, I'm only talking about the plea hearing itself. My experience is that the trans, well, the court reporter doesn't speak Spanish and isn't recording those conversations. So I don't think there could have been, you know, normally, what happens is the there's a staccato presentation where the Yeah, I know, I just didn't know if there's any recording of the translation, since that could be relevant sometimes. So I, in, I would say, with confidence, no, because those are traditionally not, not done. So no. And I would assume that the translator and or the lawyer went through the plea agreement prior to the courtroom. I mean, that's certainly standard practices for a lawyer to review it. And I don't know, you know, if it was done with with an interpreter or not, knowing the lawyer knowing as a Spanish speaker, I would assume he would have reviewed it in person beforehand. I mean, that's, that's what we do with a lot of clients. Have you made any claim, Mr. Zucker, on behalf of your client, that but for this so called ambiguity, in the meaning of it, he would not have pled guilty? No, I don't think I don't think the issue is whether or not he would have pled guilty. I think the issue is whether he would have waived the that's, I think what the issue is, we're not seeking to withdraw the appeal, the plea here. And we're not complaining that there was a constitutional defect or any other defect in the plea itself. What we're our error that we're alleging is that the waiver of the sentencing challenges was not appropriately done. So just so I understand, under the plea agreement, there were only two right? One is if it if there was an upward departure from the guideline range, and two, if it if the sentence exceeded the statutory maximum. Yes, your your interpretation of the of the written plea agreement is correct. Okay. And neither, neither, neither one of those circumstances is materialized. Is that correct, too? Yes. And I agree. And yet he question that he says he, I mean, your your position then is, nevertheless, he still can appeal. Yes, he can appeal because there was an ambiguity in the colloquy with the court during the plea hearing. It's the exact situation as in Brown, as in Godoy, where during the colloquy, with all due respect to the trial court, confusion was created about the waiver of the sentencing enhancement. Can I ask about that about that? Is it Mr. Zucker? Is it this statement that so if it was unlawful or involuntary, or some other fundamental defect of a constitutional nature, you can appeal that? Is that the ambiguity? Is that the sentence? It's several of them. It's that it's also the lines about what you could appeal if the sentence exceeded the maximum without defining that the maximum is the statutory maximum rather than the guideline. But a few a few pages earlier, he did say the statutory maximum, didn't he? I believe that's correct, but then the ambiguity is created in terms of the last part of it where he says, okay, but you could appeal. Well, let me just ask you about the sentence that I read to you. So if it was on, I don't have that part of the transcript, which which part are you relying on? It's in the supplemental appendix of page 102 to 103. It's you you rely on it. Yeah, it's at the top of 103. Forgive me, I don't have it. I don't have it printed out. All right. Well, I'll read it to you again. So if it was unlawful or involuntary, or some other fundamental defect, you can appeal that. How can a sentence be involuntary? I mean, sentence? That's really not the part I'm focusing on that created the confusion, Judge. I would direct the court. It's on page 79 of the appendix, where it says, but you can appeal if the sentence exceeded the maximum, which would be an illegal sentence, frankly, or if there was an upward departure that the court imposed. But I thought you were making two different arguments in your briefing, at least. One was that you get some ambiguity out of the maximum part, which is what you've been focusing on this morning. Right. But then another one was that you get some ambiguity out of the sentence that Judge Randolph just read to you. I thought you were making two different ambiguity arguments. And if we just put to one side for the moment, the maximum argument, I know you don't agree with me, but let's just assume for this purpose, that maximum means statutory maximum. And we just focus on the other source of ambiguity that you identified in your briefing, which is the sentence that Judge Randolph identified. And on that, do you have a response to the question about the use of the word involuntary? I guess I have a response to saying he certainly wasn't voluntarily conceding to to the enhancement because that was being contested throughout. Now, I guess I guess the question is this that so the sentence just to refresh your memory is so if it was unlawful or involuntary, some other fundamental defect of a constitutional nature, you can appeal that. And it seems like both you and the government are focused rightly focused on that sentence. And it seems like there's common ground on the following that if if the word it was replaced by plea, that would be one thing. If the word it was replaced by sentence, that would be another thing. If it was sentence, then it would favor you. If it was plea, it would favor the government. And the question would be, if it's sentence, it also uses involuntary in the same sentence. So why? Why is not the inference from that, that one would understand her to have been referring to the plea rather than to the sentence? You may well have an answer to that. I'm just curious about the plea. But I think what I would focus on, I'm sorry, what did you say? I didn't I didn't hear it. I'm not sure which the court was referring to on the air. So that could be that's really part of the confusion and ambiguity. But the the other portion of this was the confusion between upward departure and enhancement and the unlawfulness, it would be unlawful to enhance a sentence. I'm sorry, yeah, to apply the leadership enhancement absent a factual predicate for it. And I think that's where part of the ambiguity lies here or the central part. Well, you also have a due process argument, right? I thought your part of your argument was that there's a due process problem with relying on the proffer statements when the your client was not when the defendant was not allowed access to the proffer statements. Yes, I mean, certainly that that was the that is the due process. And those proffer statements were incorporated into I mean, the government's claims that it was a trial transcript, but much of what they're relying on doesn't occur in the trial transcript. And we've gone through the facts on that. But the proffer statements were incorporated into the pretrial services report. I mean, that's where they get their facts from is where the government disclosed in the in the their interpretations or their summaries of the proffer statements. So that's the due process. Judge Randolph, did I answer your question? I'm not sure I responded. Yes, or no, I think that one of the one you answered the question, but I don't know if you did it satisfactorily. So but, you know, one of the the other things that that strikes me is that the plea agreement itself said the manner in which the judge imposes the sentence cannot be challenged on appeal. Well, but the question is, when the plea colloquy injects confusion into it, what what is controlling and I look at the I think it's a good oil case that says, look, if we can look at a plea colloquy to interpret and rectify an omission in the plea agreement, then we have to look at the plea colloquy to see if that infects confusion or misunderstanding. And I suggest that's what occurred here. You know what, if I just complete, especially when we're talking about somebody with this background, you know, second grade education, another country not familiar with the nuances of our law, let alone sentencing guidelines, and the distinction between an upward departure versus an upward departure. And that's something the philosopher Karl Popper used to talk about. And one of his principles was that if, if you have to define your terms before you can speak, nobody could speak, because more definition doesn't lead to greater, greater clarity, it leads to infinite regression. And if every time the word it is used in a plea colloquy, the judge has to define it, that it's going to lead to infinite regression, because when you define something, you use words, and when you use words, you have to define those words. All right, I'm not going to quarrel with you. But I think with all due respect to the trial court, it created confusion rather than clarity. And I think how they summarize it to say, as you said, okay, the maximum I'm talking about here is the guidelines, for instance, or had she clarified upward departure versus enhancement for somebody in his in my client's position, those are confusing terms. And we couldn't, it's unfair to expect him to understand the nuances and differences between them, based on the colloquy that was given. His lawyers said that he did understand them as a lawyer, was the lawyer under oath? Well, I mean, the lawyer could give his understanding, and the lawyer, I think it only comment on what occurred in terms of interpreting the plea agreement. But it was when the court tried to try to clarify or tried to summarize, I guess, during the plea colloquy that I think the confusion was created, because you can appeal these issues, and these issues if there's a constitutional defect, or there's an upward departure, and to this person to expect him to understand the nuanced difference between an upward departure and an enhancement is unrealistic. Can I ask you on your second issue, I just want to make clear something, are you raising a Genk's Act argument? You talk about, you know, that they didn't give you information about the folks whose testimony was being used, but I wasn't clear from your brief, if you were still pursuing the Genk's Act argument. I don't think we presented it as that, because I don't think Genk's would have applied. I just want to be clear. I don't know, but I assume trial counsel was given the Genk's of the witnesses  Yeah, it was a little ambiguous to me. Okay, I think, I think there were other witnesses that related to the proffer that weren't called, and I think that was the basis. Actually, I'm wrong on that. I can have a quick moment to consult. But was there additional Genk's that wasn't disclosed? Apparently, I misspoke. There was a Genk's request that was not complied with. Of course, but I think it related to aspects of the witnesses cooperation that weren't relevant, particularly to sentencing. Is that correct? You can, you can also clarify it on, you can also clarify it on rebuttal if you'd like. Okay. But I thought that's a better idea. I thought that, I thought that the principal argument you're making, I didn't see you make a Genk's Act argument, actually, in your briefing. I know, I know you noted it. Okay, I didn't. I didn't. I'm just responding to Judge Middleton's question. Sure, sure. No, absolutely. Yeah. I'm just trying to clarify. Okay. Yeah. And appropriately. Yeah, no, no, I, I, our, our contention was that there was a due process violation because the profit statements weren't disclosed in advance and there was a factual interpret, there was just an interpretation. Let me try and phrase that better. The leadership enhancement should not apply based on the facts that were presented because Lorenzina Lima didn't have control over anybody. He had control only over the property. He didn't negotiate anything. He couldn't fire anybody. He didn't set any prices. He didn't do anything except to say, yes, you can use my property. And, and he consented to that and his, and he wasn't even involved in the negotiations. His kids took care of all that. Got it. Okay. Let me just make sure my colleagues don't have further questions for you at this point. We'll give you a little time for rebuttal. Thank you. Okay. Thank you. Um, Ms. Hostetler, we'll hear from you now. Your honor, may it please the court. I'm Kelly Brooke Hostetler and I represent the United States. Lorenzina Lima waived his right to challenge, to bring these claims when he pleaded guilty. He acknowledges that this is covered by the written plea agreement and nothing in the plea colloquy causes conflicts with that written plea agreement. Um, as he went into the plea, the start of the plea colloquy, the district court asked him to let him know if anything that he said contradicted what he understood from his attorneys, uh, prior to the start of the plea colloquy, uh, when he, when he signed the plea agreement, he said that he attorneys tested, attested that they had fully explained all of the consequences of it. Um, and the statements that the district court made, um, were not ambiguous and to the extent they're not. Can I ask you about that? Just cause I think at least it's at least common ground, I think, between you and, um, uh, defendants council that, that, um, even if the plea agreement was totally clear that things can happen in the course of the colloquy that inject sufficient ambiguity into the dynamics such that the, uh, individual is not bound by the plea waiver anymore. Right. I mean, that's, that's common ground under our decisions. So then the question becomes what exactly happened during the colloquy and on pages, uh, supplemental expenditure, uh, one Oh two to one Oh three, the ones we were speaking to Mr. Zucker about earlier. Um, she, the district court starts out by saying there's two kinds of appeals. There's an appeal based on the statute and you're giving up those rights. And I'll go over those in a moment. And then it seems like she, she switches to the second kind of appeal because she laid out that there's going to be two kinds of appeals. The second kind of appeal is your right to appeal any constitutional defects you're not giving up. And so it's, why isn't the right way to understand that, or at least a reasonable way to understand that, that there's statutory defects you could be appealing about, and then there's constitutional defects you could be appealing about, and then the constitutional defects, you're not giving those up, the statutory ones, you did give those up and, and he is making a constitutionally grounded sentencing appeal here, and that he's saying that there's a due process problem with relying on proffer statements that were never given to me. Almost immediately after that sentence in the, from the district court, she goes on to explain the statutory sentencing right that he's giving up. But as part of that, where she says he's giving up his right to appeal a sentence, she also says you're giving up the right to include any challenges to the constitutionality of the sentencing guidelines. So it can't have been that the first was just all about constitutional challenges and the second was just about. Well, but there's a difference between the constitutionality of sentencing guidelines and a constitutional claim relating to the sentence, to the administration of the sentence, right? And so I, even if that's true, even if, even if subsequent statements, it would be one thing if a judge said, and I'm not saying that any judge could be expected to do this on the fly. I think this is a really difficult thing to do. I don't mean to slight what a district judge faces here, but it'd be one thing if a judge said, let me just scratch what I just said, let me start over. Here's a clarified understanding. And it would be another thing to go on and elaborate in a way that doesn't necessarily in the defendant's eyes, clarify what had been said before. And so even if later on, there's a reference to constitutional challenges to the sentencing guideline, that wouldn't necessarily ameliorate an indication from prior comments that you can raise constitutional defects. Well, I think looking at everything in context, I mean, starting with where the defendant would have been when he came into the plea colloquy, which is understanding that he can't appeal his sentence, as long as it's not about the statutory maximum or is an upper departure, has been told that if he hears anything that conflicts with this, he should let the district court know. And then he hears, you know, if there's any concern or question at that point in time about, oh, maybe I could bring a constitutional challenge to my sentence. She goes on to, to, to clarify that saying, no, no, no, this is not just. You know, a constitutional challenges and be statutory challenges. We're really talking about appealing the conviction versus appealing the sentence with her later clarification, which comes almost immediately after. And if you have any, can I just ask this question then? And then I'll stop this line of questioning, which is if, if the plea colloquy stopped after you're right to appeal any constitutional defects, you're not giving up, you're not waiving that. So if it was unlawful or involuntary or some other fundamental defect of a constitutional nature, you can appeal that. And if it just stopped there, then at that point you would agree that there was ambiguity. But then what you're relying, is that right? Or am I wrong? And what you're relying on a subsequent statements that, that clarified what she was saying. I think the subsequent statements are really helpful and really important, but if we were presented just for that, I'm not insured entirely sure that would be ambiguous either for the reasons judge Randolph said, because of this phrase of involuntary, which makes it seem like we really are talking about the, the plea there and not the sentence. But here we don't have to parse that because we do have the immediately thereafter clarifying statements. And the same thing with the second statement. Can I follow up on that just to follow up, because that, that is now referencing the unlawful involuntary is preceded by you're giving up all your rights to appeal. And I assume that language includes both challenging the plea and the sentence. Yes. All your rights. And then she says, there's two kinds for all your rights. There's statutory and constitutional. She has a narrative yet from all your rights. So the constitutional defects must refer back to including constitutional defects. Right. In the sentencing. And that's when she says you're not giving up or waving those. And then we have this. So if it was unlawful and I had asked, is it, is it your understanding too, that there's no recording of the translation that's done by the Spanish translator? That's my understanding as well, but I am not positive. Well, it's just because we all talk about it, but you know, in Spanish, there's different words for it, depending on the, the noun that that pronoun is referring to. And it could very well, there's at least on some translations, it's different whether it's talking about an agreement or a sentence. Right. So I think it's a little hard to rely on the singular English meaning of this it that we are thinking about. We have to understand that in Spain, we have to look at this from the perspective of the defendant with a second grade education that there's not a single it in Spanish and and having just, and if all the language up to that sentence was about waiving all appeal rights, except constitutional defects, which were both plea and sentence. And then you have one word that seems to describe a sentence and one that could describe the plea. I don't understand the argument that we suddenly know because of it, that everything in that sentence was only talking about the plea when nothing before it was narrowed down to just the plea. Well, again, I do think you can look at what comes after it, where the court makes clear that you just can't bring any constitution. After that is, do you under, you're willing to give up these rights? And he says, I didn't understand that on 104. And then she gives a super high level, just understand you're giving up these statutory rights. And she said, I agree with that. So you gotta, if we're going to look at the whole transcript, which I agree we should, we got to look at the before and the after. And then this is, I think we have to look all the way to when his lawyers say, look, this has been very difficult. He said, he just wants to play and he'll sign anything we put in front of them. I mean, there's a lot, this is one of the most extraordinary plea transcripts I have ever read, deeply troubling, honestly, on, you know, through the efforts to just find some magic formulation of words that he would agree to. So, and I just, I don't think these other clarifications you're talking about come, they're not right next to it. They come pages later. So what are we to do with that? Well, first of all, the difficulty in getting him to agree was on the articulation of the facts. That was what the real sticking point was. It was not on the waiver of the rights. But it was in that context that the attorney said, look, it's just, I want us to plead and he'll sign anything we put in front of him. And was never even given his own Spanish translation of the plea agreement. And so that, I think we, I think that, that was not limited to the facts. They were talking about his state of mind and how he was approaching this whole process. Yes. Although I don't, I don't read from the transcript any reservation on his part in terms of the rights he was waiving, but only in terms of what responsibility he would have and what, whether he would be exposed to the leadership enhancement and whether he would have responsibility or whether the responsibility would be attributed to his sons. And I would also point out, I mean, we, there is that immediate clarification on page one or three of the government's appendix, but also later on, there is that discussion of the statutory maximums at page 147 to 149, where the district court clearly defines what any illegal sentence would be. It makes clear that it's referring to a statutory maximum. I would also point out. It's normal not to provide. Oh, I'm sorry. You want to finish your point? Go ahead. I just wanted to say, I would also point out that in the middle of the plea colloquy, he did have almost 30 minutes with his attorneys in private. So if there were issues about the rights he was waiving at that point in time, it would have been an opportunity for him to discuss any confusion that he had and to clarify with his attorneys at that point in time, if there'd been things that were. Well, there was a lot of water under the bridge by that point. And it seemed like the attorneys were just trying to figure out some formulation of words that would, he would be able to say yes to, um, is it normal not to give a Spanish translation to a Spanish speaker of the plea agreement itself? I don't know why that wasn't provided. And it's normal, right? Isn't that the normal? I thought you see many more of these than I do. So I won't, I I'm just in my experience. I've it's generally been, we've been informed that they've been given a Spanish translation. So I was confused here. I don't know. I don't know why there wasn't one given, but then it's more, the more ordinary practices to do. So I don't, I don't know your honor, what the normal practice is. Oh, you don't know? I don't know. Oh, okay. All right. Um, okay. Can I, can I, um, take you past the waiver then just, uh, for arguments for, I know your argument is that there, we shouldn't get to the merits at all, but if we get to the merits, unless my colleagues have further questions on the waiver, uh, I just, uh, want to go to the merits for a second. So on the merits on the part of the argument that's made by the defendant to the effect that the, both the government and the district court relied on Linares Cordon's, um, indication that, uh, Lorenzana Lima was the leader and largely, and was largely deferred to, and as I read your brief, your, your argument on that as harmless error, because it doesn't sound like you really take issue with the notion that there wasn't trial testimony that supported that proposition. It would have had to have come from the proffer statements. And if it came at all, and so you're not disputing for our purposes, the notion that those came from that part of it came from the proffer statement. The only question is whether, even if that was erroneously injected into the equation, that it was harmless, right? Well, your honor, I'm not even sure that that comes from the proffer statements. It's not clear from the summary offers. It just seems like it was a conclusory statement that got in there and then got repeated. Right. Exactly. And it was injected by the government to be fair and initially, and then, and the district court picked up on it. And so then the question becomes, is that harmless as you rightly, I think surmise in your brief, that's where we should point, point you on that. And on that, um, the district court did say in its opinion on it, it did rely on it and its opinion in imposing the leadership enhancement, it did say at, um, three 24 of the appendix, the government asserts that both Herrera Garcia and Linares Cordon acknowledged Mr. Lorenzana Lima as leader of the DTO. So that seems to be a reference to it. Then on three 27, um, there's a statement. He being the defendant was seen by his co-conspirators as a leader and point person in control. And I don't think we're talking about the sons there. I think we're talking about Herrera and Linares cause the sons are referred to separately. And then in concluding, there's the statement on three 29, both Herrera Garcia and Linares Cordon deferred to him as did his sons. And so there was at least some reliance on the notion that Linares Cordon had identified Lorenzana Lima as a, as the leader, IE somebody to be deferred to that seems to be a, have made its way into the decision in a few places. And the question becomes, if that's true, then how is it harmless beyond a reasonable doubt, assuming that that's the right standard? Yes. Um, I think the evidence is overwhelming that the district court points to, uh, based on just Herrera Garcia's testimony alone, which she carefully documents in the written order. Um, also again, in her sentencing policy or at sentencing, she goes through this, her reasoning again. Um, and there she specifically says she went back and checked the transcripts and it is, they are correct. Um, and there's no reference to Linares Cordon and his deference in the, at sentencing. Um, and just looking at the evidence based on Herrera Garcia, uh, fully demonstrates that Lorenzana Lima was a leader or organizer. Even if she, that, that may be true as a matter that could, in other words, I mean, if it was a sufficiency challenge, then you could say that, yeah, the evidence was definitely sufficient, but in terms of the way she characterized her finding that the leadership enhancement was met, there's multiple places in her written rendition of it that reference the exact thing that we have to assume for our purposes came from the proffer. Yes, but, but she cites to the trans, she doesn't cite to the transcripts there. Again, those are also very perfunctory, um, and conclusory statements, whereas where she's relying on the evidence, it's all cited to Herrera Garcia, um, except for one small reference to Linares Cordon in terms of the scope of the conspiracy, um, for what she was an appropriate, uh, witness. And when you look at what she says at sentencing, there is no mention of Linares Cordon. And she sets out the evidence there as well. Um, clarifying her, if there was any question, clarifying what her decision making was. Um, it sort of struck me. Sorry, you know, go ahead. It struck me that the language, you say the evidence was abundant from Herrera Garcia, who was a cooperating co-conspirator, um, but all the language seemed to be in terms of, he had concerns, he suggested, he advised, um, that's not language, at least I'm used to seeing in these types of enhancements. If, if I'm meeting with my law clerks on how to deal with a case and they make suggestions to me and have concerns that are expressed about a certain course of actions and provide me with some advice. And I follow that. Are they leaders in this chambers? No, Your Honor. But, uh, very oftentimes senior members, if I go to case conference afterwards, after an argument and my colleagues have concerns and advice and suggestions that I find persuasive and decide to go along with, does that, that doesn't make them leaders of me, it makes them peers, right? Correct. Right. The language here seems to be one of, at best, maybe a peer or someone who, you know, it's his property. They are going to hear him out. And every now and then he says some things, but Herrera Garcia, who was like the point person for the Sinaloa cartel in Guatemala, he was a huge player in this conspiracy. He was a bigwig. And the notion that he was taking orders from this farmer, just because he had concerns or advice about avoiding local police, it just strikes me as very odd way to think about things. I just, the evidence, I'm curious how you wrapped your head around that concept of leadership, rather than how can we tell that he wasn't simply just probably peers, probably too much of a word, but simply another person that he was, would listen to now and then. A couple of things, Your Honor. First, senior personnel in an organization often speak in softer language. They don't necessarily say, I am ordering you to do something. They sometimes speak in more polite language, even though everyone understands that it is a direction. Well, he's not the godfather here. I mean, you really think that Herrera Garcia, with his position in this when Mr. Lorenzana Lima said, I'm concerned about these really large trucks coming into this small town. Maybe we should try another location. That was an order? Herrera Garcia interpreted that as an order? Did he say anywhere that he interpreted that as an order? He didn't say that specifically, but I would give an example with respect to his transport from El Salvador, that before he finalized any of the agreements in El Salvador, he spoke with Lorenzana Lima to make sure that it was OK. So I think it was OK as in like permission or something to get his advice to make sure this is workable because he's the guy on the ground. To get his OK, because the operations couldn't start. They couldn't expand until Lorenzana Lima gave his OK. Sorry, that was the evidence, at least on the record, was we're talking about sort of picking the start date or something that was seemed to the evidence was quite ambiguous, whether that was simply when it would first start versus every single time that I would have thought this is a massive conspiracy. And if this guy was a leader, I certainly would have thought there'd be more evidence in the record of him somewhere ordering someone subordinate to him. And I guess you wouldn't say Herrera Garcia was subordinate to him, would you? I would say with respect to Lorenzana Lima's property that Herrera Garcia was subordinate in terms of how they were using it. And I would also point to the specific instance in which Lorenzana Lima instructed, according to Herrera Garcia, instructed that the warehouse be renovated. So there were people who instruct Herrera Garcia or it was Herrera Garcia who wanted it renovated. Right, correct. And Lorenzana Lima instructed personnel. So he was a leader organizer. Even if the court doesn't believe that Lorenzana Lima supervised the construction, he only has to have control over one person under the guidelines and guidelines to be eligible for those for those. OK, thank you. Thank you. If my colleagues don't have any further questions, we'll hear from Mr. Zucker for his rebuttal. Thank you, Ms. Hostetler. Thank you very much. Mr. Zucker, we'll give you two minutes for your rebuttal. Appreciate it. To respond to your question regarding the Jenks, the Jenks was not provided. It was requested. But the reason the court gave was because the witnesses weren't testifying themselves. Therefore, Jenks didn't apply, which is so I hadn't spoken earlier. I'd also like to note that, Judge Miller, you talked about I think it was you that talked about there was the point where the defendant said, I don't understand that part of the waiver or I don't understand. And then there was a re-instruction, which was really just a repetition. And then there was that pause where he takes a break. The counsel says, can you take a break? And I think all of that kind of indicates some of the confusion, some of the stress and causes it should cause some concern about the defendant's appreciation and understanding of exactly what the nuances were here. I think you point to make a good point when you talk about there was I'm not sure where it fits in exactly in terms of the waiver, but this whole plea colloquy was troubling in the sense, number one, the lawyers were opposed to the defendant entering the plea and it was like everybody was kind of struggling to make it go down. At one point, the trial judge says, well, it's bare bones, but I guess it'll do. I guess we've we've met the elements. There was the whole issue about whether or not the defendant was part of a conspiracy to distribute to the United States when he had no involvement with the United States. And they said, well, OK, but he was paid in dollars. So from that, he could have inferred that the drugs were going to the United States. The only other point I'd like to make in terms of the leadership is I think the case that's clearest here and it should be controlling is the shoe decision where they said a leadership enhancement was given to a tavern owner who allowed drugs to be distributed in his tavern and had control over who came in and did it. And that was reversed, saying he didn't control anybody. He controlled the property. He didn't set the prices. He didn't do the negotiations. He didn't tell anybody what they could or could do. He just gave them permission to use his premises. That's not enough for a leadership. And that is directly analogous to what. Lorenzana Lima's control was of his property. He could control his property, but so, Mr. Zucker, your point on the leadership is that the facts that the district court relied upon are unsupported. Is that it? It's yes. That's certainly it in terms of the factual determination. And then, of course, also the due process violation by it. By it, I meant the the district court's finding. Yes, we thank you for defining it in this context. And I would say we would allege both those. It's are the error. One, that there was not a factual predicate and two, that there was constitutional violation in admitting the profits of relying on stuff without allowing the defendant access to it and the ability to challenge it. OK, thanks. That is all right. Thank you. Thank you, counsel. Thank you to both counsel. Mr. Zucker, you were appointed by the court to represent the appellant in this case, and the court thanks you for your assistance. We'll take this case under submission.
judges: Srinivasan, Millett, Randolph